UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, INT'L UNION; and its LOCAL UNION 26, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | No. 1:08-cv-285 *Edgar* |
| PINKERTON GOVERNMENT SERVICES, INC.; and JOHN DOE 1-5, | ) ) ) ) | |
| *Defendants.* | ) | |

**MEMORANDUM**

Plaintiffs United Government Security Officers of America, International Union, and its Local Union 26 (collectively "UGSOA") bring this action to vacate and modify an arbitration award pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Defendant Pinkerton Government Services, LLC ("PGS") moves to dismiss the action for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). [Court Doc. No. 5]. The UGSOA opposes the motion to dismiss. [Court Doc. No. 9]. The court has reviewed the record, the arguments of the parties, and the applicable law and has determined that Defendant PGS's motion will be **DENIED**.

    **I.**    **Background**

This action arises out of the arbitrator's resolution of a grievance filed by a grievant who is a former employee of PGS. UGSOA is the exclusive bargaining representative of the employees of PGS who work as security officers at the Sequoyah Nuclear Plant in Soddy Daisy,

Tennessee. [Court Doc. No. 1, Complaint, ¶ 3]. PGS and UGSOA entered into a collective bargaining agreement ("CBA") on July 10, 2005. [Court Doc. No. 14-1, CBA]. The CBA was in effect until July 9, 2008. *Id.*

The CBA contains several provisions pertaining to the termination of employees and to the arbitration of disputes between the parties. CBA, Art. II, Art. IX, § 5, Art. XI. It indicates that "[i]ncluded among management rights is the right to . . . discipline, suspend, or discharge employees for just cause; . . . the right to require employees to observe Employer policies, rules and regulations not inconsistent with this Agreement." CBA, Art. II. The CBA does not define the term "just cause." With respect to the grievance process, the CBA provides the following regarding the duties of the arbitrator selected by the parties:

> The award of such arbitrator shall be in writing and shall be final and binding upon the Employer, the Union and the employee or employees involved. The arbitrator may consider and decide only the particular grievance presented in the written stipulation of the Employer and the Union, and the arbitrator's decision shall be based solely upon an interpretation of the provisions of this Agreement. The arbitrator shall not have the right to amend, take away, modify, add to, change or disregard any of the provisions of this Agreement. In the event that an arbitrator shall determine that an employee has violated the Employer rule, regulation or policy for which said employee was charged, the arbitrator shall not have the right to reduce, modify or in any way alter or mitigate the penalty or discipline assessed by the Employer.

CBA, Art. XI, Step 4, § 4.

The arbitrator's decision in this action pertained to a grievance by a former employee of PGS, Steve Roberts. At the time of his termination from PGS, he was the President of UGSOA, Local 26. The Complaint alleges that:

> The gravamen of the grievance and arbitration concerned the termination of Steve Roberts, who while acting as President of the UGSOA Local 26, was approached by a union member seeking direction and advice regarding a disciplinary matter. Approximately three months after the event, Mr. Roberts was terminated for

> failing to disclose the information he obtained from the union member to the
> Defendant. Mr. Roberts considered the information given to him as confidential
> and privileged because the act of a union member coming to him as an officer for
> advice was a protected, concerted activity.

Complaint, ¶ 9. The arbitrator concluded that PGS had "just cause" pursuant to the terms of the CBA for terminating the grievant, Mr. Roberts. [Court Doc. No. 1-1, ("Arbitrator Opinion")]. The Complaint asserts that "Arbitrator Dailey exceeded his authority and rendered an Opinion that constitutes a misuse of his powers, is in manifest disregard of the law and otherwise renders the CBA between the parties a nullity." Complaint, ¶ 10.

The Arbitrator Opinion provides the background factual situation that led to Mr. Roberts' termination. *See* Arbitrator Opinion. PGS provides the physical security at three Tennessee Valley Authority ("TVA") nuclear power plants in Tennessee. This action concerns events occurring at the Sequoyah Nuclear Plant in Soddy Daisy, Tennessee. Mr. Roberts was an Armed Response Officer ("ARO") working for PGS who helped provide physical security at the Sequoyah Nuclear Plant. PGS terminated Mr. Roberts on October 5, 2007 for "willful violation of Employer or client rules or regulations." Arbitrator Opinion, p. 4. PGS terminated Mr. Roberts for not reporting an incident involving the falsification of security documents of which he had been informed on May 31, 2007.

On May 31, 2007, one of PGS' security sergeants, Sergeant Hickey, failed to check an M-16 rifle carried by one of the AROs, Bonnie Houle, for missing ammunition rounds during the first four hours of that officer's shift. The sergeant was required to check the rifle's ammunition during the first part of the ARO's shift. The sergeant checked the ARO's other equipment, with the exception of the M-16's magazine, and completed the required paperwork relating to the inspection.

-3-

Several hours into ARO Houle's shift, the TVA plant manager asked ARO Houle if she knew anything about an M-16 round of ammunition that had been found on the second floor of one of the plant's buildings known as the Diesel Building. ARO Houle responded that she knew nothing about the loose ammunition. Another sergeant security officer asked ARO Houle to return to the Diesel Building where the loose round of ammunition had been found. Sergeant Hickey also arrived at the Diesel Building and checked ARO Houle's rifle magazine where she noticed that a round of ammunition was missing. Sergeant Hickey then took steps to falsify the inspection records to make it appear to PGS that she had discovered the missing round of ammunition upon her first inspection of ARO Houle's equipment. Sergeant Hickey took the prior paperwork and then asked ARO Houle to rewrite the inspection paperwork later that evening during a meeting following their shifts.

On June 2nd ARO Houle called the grievant, Steve Roberts, requesting union representation for rewriting the inspection paperwork. ARO Roberts did not report the falsification of the inspection records because he believed that the communication was privileged and involved "concerted activity" protected under the National Labor Relations Act ("NLRA"), 28 U.S.C. §§ 157, 158.

On September 15 an employee from the Nuclear Regulatory Commission ("NRC") contacted ARO Houle to discuss the falsification of documents. ARO Houle then met with the NRC employee and informed her about the situation surrounding the falsification of inspection records. Although the NRC employee asked ARO Houle not to discuss the situation with anyone else, ARO Houle also told another individual, Lieutenant Pope, at the request of the grievant, about the entire situation. Not long after the meeting with Lieutenant Pope, PGS

terminated Sergeant Hickey, ARO Houle, and the grievant Steve Roberts for failing to report the falsification of records. The Arbitrator Opinion only addressed the termination of Steve Roberts.

The Arbitrator Opinion indicates that the grievant "testified that he knew that he was required to immediately report any security incident, including the falsification of paperwork." Arbitrator Opinion, p. 7. The Arbitrator concluded that ARO Roberts' failure to report the falsification violated PGS' policies, as well as the terms of the CBA. The Arbitrator found that the CBA did not contain any reference to any kind of privilege for violating certain of PGS's policies. After extensively reviewing the positions of the parties, the arbitrator specifically found the following:

> With respect to the issue framed by the evidence, the Arbitrator accepts the Union's position that communications between an employee and a union official are under certain circumstances protected activity under Section 7 of the NLRA which do not have to be disclosed to an employer. But where the union official is also an employee a balance must be struck between his responsibility to his employer as an employee and his responsibility as a union official to represent bargaining unit employees. . . .
>
> Viewed in this context, compliance with Employer Procedure 05-224, Conduct of Security Operations, Section 3.1.2.K. which requires armed response officers to report all breaches of security and security violations to their immediate supervisors and with TVAN Site Security Instruction SSI-17.1, Section 3.0 which requires security officers to ensure that all paperwork is accounted for, accurate and complete, must be strictly adhered to. This is evidence by Employer Procedure 06-204, Administration of Discipline, Section 6.1.17 which makes falsification of records or other documents grounds for dismissal. . . .
>
> The Arbitrator after careful consideration of the record evidence and the briefs filed by the parties finds that the balance in the instant case must be struck in favor of disclosure. This conclusion is based on the importance of the security work carried out at a nuclear facility. Granted failure to report the falsification immediately seems like a small matter but this policy and others like it are an integral part of the security plan the Employer has designed and implemented at the facility. The stakes are too high for the Arbitrator to second guess the Employer on security matters. Accordingly, under Article II of the collective bargaining agreement the Employer had just cause for terminating the Grievant's

employment for failing to immediately report the falsification and therefore the confronting grievance dated October 15, 2007 is denied.

Arbitrator Opinion, pp. 14-17.

Following the Arbitrator's decision, the UGSOA requested that the National Labor Relations Board ("NLRB"), Region 10, review the Arbitrator's decision and requested that the NLRB not defer to the Arbitrator's opinion. *See* [Court Doc. No. 6-2]. The NLRB, Region 10, issued a decision on December 5, 2008 indicating that the Arbitrator's decision was "not clearly repugnant to the policies of the" NLRA. *Id.* Following Region 10's determination, the UGSOA appealed to the Office of the General Counsel for the NLRB. [Court Doc. No. 6-3]. Plaintiffs contend in their appeal that ARO Roberts was engaging in "protected activity" under the NLRA and thus, that it violated the NLRA for Defendant to terminate him. It appears that the Plaintiffs' appeal is still pending with the NLRB. Plaintiffs have brought this action pursuant to 29 U.S.C. § 185 to modify and vacate the arbitrator's award. *See* Complaint.

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b) provides in relevant part:

> Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:
> (1) lack of subject-matter jurisdiction;

Fed. R. Civ. P. 12(b)(1). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996). Further, a district court may "resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction." *Id.* The Sixth Circuit adheres to the standard of review for Rule 12(b)(1) motions explained in *Mortensen*

*v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977):

> The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. . . .
> The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction–its very power to hear the case –there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen*, 549 F.2d at 890-91). The motion to dismiss before the court includes materials beyond the complaint; therefore, this court will weigh the facts in determining whether it has jurisdiction.

**III.    Analysis**

Section 301 of the LMRA states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

-7-

29 U.S.C. § 185(a). Thus, Section 301 provides for district court jurisdiction over actions between a union and employer for alleged breach of contract.

However, the NLRA also contains protections for parties involved in collective bargaining agreements. Section 7 of the NLRA provides that:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a)(3) of this title.

29 U.S.C. § 157. Section 8 of the Act provides in part that "[i]t shall be an unfair labor practice for an employer – (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . ." 29 U.S.C. § 158.

In *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, the United States Supreme Court explained the exclusive jurisdiction of the NLRB for unfair labor practices pursuant to the NLRA:

> At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. . . . When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

359 U.S. 236, 244-45, 79 S.Ct. 773, 779-780 (1959). Thus, in what has become known as the *Garmon* preemption doctrine, the Supreme Court made clear that the NLRB has exclusive jurisdiction over violations of the NLRA that are alleged to be "unfair labor practices."

-8-

The parties do not appear to dispute that Plaintiffs are pursuing their remedies for an alleged unfair labor practice in their appeal to the NLRB. However, Plaintiffs argue that the NLRB's jurisdiction is concurrent with this court's jurisdiction pursuant to 29 U.S.C. § 185(a) over the alleged breach of the CBA. It is possible for federal courts and the NLRB to have concurrent jurisdiction over claims which amount to both an unfair labor practice pursuant to the NLRA and to a breach of a contract between a union and an employer under Section 301 of the LMRA. For example, in *Smith v. Evening News Ass'n*, the Supreme Court noted that:

> In *Lucas Flour* as well as in *Atkinson* the Court expressly refused to apply the pre-emption doctrine of the *Garmon* case; and we likewise reject that doctrine here where the alleged conduct of the employer, not only arguably, but concededly, is an unfair labor practice within the jurisdiction of the National Labor Relations Board. The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301. If, as respondent strongly urges, there are situations in which serious problems will arise from both the courts and the Board having jurisdiction over acts which amount to an unfair labor practice, we shall face those cases when they arise.

371 U.S. 195, 197, 83 S.Ct. 267, 269 (1962) (citing *Local 174, Teamsters, v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571 (1962); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318 (1962)). *See also, Local 12934 of Int'l Union, Dist. 50, United Mine Workers of America*, 459 F.2d 221, 224 (6th Cir. 1972) (relying on *Smith* and noting that "[t]he fact that the claimed contract violations may also be unfair labor practices within the exclusive jurisdiction of the Board does not deprive the court of jurisdiction over appellee's § 301 suit"). In *Smith* the Supreme Court concluded that the alleged unfair labor practice of discriminating between union and non-union employees arguably violated a specific provision of the collective bargaining agreement which prohibited discrimination against employees because of their union

-9-

membership. 371 U.S. at 196, 83 S.Ct. at 268. The Supreme Court further explained:

> The concept that all suits to vindicate individual employee rights arising from a collective bargaining contract should be excluded from the coverage of § 301 has thus not survived. The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotiation and administration of collective bargaining contracts. Individual claims lie at the heart of the grievance and arbitration machinery, are to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based. To exclude these claims from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law. This we are unwilling to do.

*Smith*, 371 U.S. at 200, 83 S.Ct. at 270.

In determining whether concurrent jurisdiction exists for claims based on Section 301 of the LMRA and Sections 7 and 8 of the NLRA, courts are wary that failure "to apply this policy [preemption] to § 301 actions would allow an 'end run' around provisions of the NLRA under the guise of contract interpretation.'" *International Brotherhood of Boilermakers, Iron Ship Builders v. Olympic Plating Industries, Inc.*, 870 F.2d 1085, 1089 (6th Cir. 1989) (quoting *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Facetglas, Inc.*, 845 F.2d 1250, 1252 (4th Cir. 1988)). Federal courts have thus deferred to the NLRB when a claim raises issues of representation. *See e.g., Facetglas, Inc.*, 845 F.2d at 1251-52; *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844 (1976).

However, where an action states a claim of wrongful discharge based on a lack of just cause for termination and there are no questions implicating union representation issues, courts are more likely to find concurrent NLRB and federal court jurisdiction. For example, in *Powers v. Troy Mills, Inc.*, the district court determined that it had concurrent jurisdiction with the NLRB where the employee claimed that his employer terminated him without just cause in

-10-

violation of the collective bargaining agreement and that the union refused to represent him fairly. 303 F.Supp. 1377 (D. N.H. 1969). The union argued that the complaint should be dismissed because the conduct complained of amounted an allegation of an unfair labor practice covered by the NLRA. *Id.* at 1378. The court refused to dismiss the complaint, noting that "although the alleged violations of the contract by defendant Union may amount to an unfair labor practice within the jurisdiction of the NLRB, this Court still has concurrent jurisdiction under section 301." *Id.* at 1379. Similarly, in *Mulvihill v. Spalding Sport Worldwide, Inc.* the defendant employer moved to dismiss the employee's claim of breach of contract for termination without just cause under Section 301 claiming that the NLRB had exclusive jurisdiction over the plaintiff's claims. 184 F.Supp.2d 99 (D. Mass. 2002). Like Defendant here, the defendant employer in that case asserted that the "breach of contract allegation [wa]s a mere subterfuge designed to avoid *Garmon* preemption." *Id.* at 102. The court rejected this argument noting that "[i]n light of its duty to construe pleadings to do 'substantial justice' under Fed.R.Civ.P. 8(f), the court has no trouble finding that plaintiff's complaint asserts a legitimate breach of contract claim that gives this court jurisdiction under § 301." *Id.* at 103. As courts in this Circuit recognize, "claims arising out of the collective bargaining agreement itself [are] properly retained by the district court in the face of a *Garmon* challenge." *Maloney v. Craft-Tech, Inc.*, 702 F.Supp. 623, 625-26 (E.D. Mich. 1988) (finding that district court had jurisdiction over plaintiff's claim that employer breached the terms of the layoff agreement).

      The cases cited by the Defendant are distinguishable from the situation presented in this case. For example, in *Parker v. Connors Steel Co.*, the Eleventh Circuit determined that the *Garmon* preemption doctrine preempted the employees' state law fraud claims, not claims for

breach of a contract pursuant to Section 301. 855 F.2d 1510, 1517 (11th Cir. 1988). In fact, the Eleventh Circuit noted in a footnote that "[i]t is clear that to the extent the employees' state law claims require the interpretation of the CBA the claims would be preempted by § 301 of the LMRA." *Id.* at 1516 n. 4. In *West Point-Pepperell, Inc. v. Textile Workers Union of America,* the Fifth Circuit affirmed the district court's determination that the NLRB had exclusive jurisdiction to determine issues of representation. *AFL-CIO*, 559 F.2d 304, 306-307 (5th Cir. 1977). While the court noted that "[c]ourts should not decide questions beyond their jurisdiction under the guise of construing contracts under Section 301" the court was addressing the issue of "determination of a union's representational status." *Id.* at 306. The question "raised by the complaint" in that case was whether the union was "a party to the contract," and the court determined that "the district court does not have jurisdiction to decide which union represents the employees." *Id.* at 306. *See also, Mellott v. General Teamsters and Allied Workers Local Union No. 992*, 534 F.Supp. 712, 713-14 (D. Ct. Md. 1982) (finding no federal court jurisdiction where issues turned on questions of representation which were within exclusive authority of NLRB); *Copps Food Center, Inc. v. United Food & Commercial Workers Union*, 733 F.Supp. 304 (W.D. Wis. 1990) (declining Section 301 jurisdiction where "[a]lthough this case would not require the court actually to rule on the representational issue whether plaintiff's meat departments are appropriate bargaining units, it would be impossible to enforce the parties' agreement without negating the NLRB's determinations on that issue"); *Local 807, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Brinks*, 744 F.2d 283, 286-87 (2d Cir. 1984) (affirming district court's determination that it lacked jurisdiction and noting that "issues of representative status are within the exclusive jurisdiction of the NLRB").

Unlike the cases cited by Defendant, this case does not involve issues of union representation. The parties are not disputing UGSOA's exclusive representation of PGS' employees. Rather, this case involves whether the arbitrator properly construed the CBA in determining that the Defendant had "just cause" to terminate the grievant pursuant to the specific terms of the CBA. This determination can only be made by interpreting the terms of the CBA and the policies and procedures of the Defendant referenced there. The fact that the underlying circumstances leading to the grievant's termination may also constitute an unfair labor practice of termination for "protected activity" under the NLRA does not deprive this court of its concurrent jurisdiction. *See Smith*, 371 U.S. at 199. Thus, the court will **DENY** Defendant's motion to dismiss for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

The more interesting question for this court will be whether the arbitrator's award should be modified or vacated under the analysis of the *Steelworkers Trilogy* doctrine. *See United Steelworkers v. American Mfg.,* 363 U.S. 564, 80 S.Ct. 1343 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358 (1960). The court believes it can make this determination by reviewing the terms of the CBA itself and applying applicable case law regarding review of arbitrator decisions without analyzing whether an unfair labor practice occurred under the NLRA. It will also be important for this court to consider its role in reviewing the arbitrator's decision where the CBA expressly provides that the arbitrator's decision is "final and binding" upon the parties involved. *See* CBA, Art. XI, Step 4, § 4. However, this is not the question that the parties asked this court to review at this time, so the court will postpone such analysis for another day.

## IV. Conclusion

As stated *supra*, the court concludes that it has jurisdiction pursuant to Section 301 of the LMRA, 29 U.S.C. § 185(a), to determine whether the Defendant breached the CBA in terminating the grievant, Steve Roberts, allegedly without just cause. Therefore, Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) will be **DENIED**.

A separate order will enter.


　　　　　　　　　　　　　　　*/s/ R. Allan Edgar*　　　　　
　　　　　　　　　　　　　　　R. ALLAN EDGAR
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE