UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED GOVERNMENT SECURITY OFFICERS OF AMERICA, INT'L UNION; and its LOCAL UNION 26, | ) ) ) ) | |
| *Plaintiffs,* | ) | |
| *v.* | ) ) | No.1:08-cv-285 *Edgar* |
| PINKERTON GOVERNMENT SERVICES, INC.; and JOHN DOE 1-5, | ) ) ) | |
| *Defendants.* | ) | |

**MEMORANDUM**

Plaintiffs United Government Security Officers of America, International Union, and its Local Union 26 (collectively "UGSOA") moves to vacate and modify an arbitration award pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. [Court Doc. No. 25]. Defendant Pinkerton Government Services, LLC ("PGS") opposes the motion to vacate. [Court Doc. No. 28]. The court has reviewed the record, the arguments of the parties, and the applicable law and has determined that Plaintiff UGSOA's motion will be **DENIED**.

**I. Background**

This court has previously outlined the basic background facts regarding this matter. *See* [Court Doc. No. 17]. The UGSOA's claims arise out of an arbitrator's resolution of a grievance filed by a grievant, Steve Roberts, who is a former employee of PGS. The grievance arose out of PGS' termination of Mr. Roberts' employment. UGSOA is the exclusive bargaining

representative of the employees of PGS who work as security officers at the Sequoyah Nuclear Plant in Soddy Daisy, Tennessee, a nuclear facility, managed by the Tennessee Valley Authority ("TVA"). [Court Doc. No. 1, Complaint, ¶ 3]. PGS and UGSOA entered into a collective bargaining agreement ("CBA") on July 10, 2005. [Court Doc. No. 14-1, CBA]. The CBA was in effect until July 9, 2008. *Id.*

The CBA contains several provisions pertaining to the termination of employees and to the arbitration of disputes between the parties. *See e.g.*, CBA, Art. II, Art. IX, § 5, Art. XI. It indicates that "[i]ncluded among management rights is the right to . . . discipline, suspend, or discharge employees for just cause; . . . the right to require employees to observe Employer policies, rules and regulations not inconsistent with this Agreement." CBA, Art. II. The CBA does not define the term "just cause." With respect to the grievance process, the CBA provides the following regarding the duties of the arbitrator selected by the parties:

> The award of such arbitrator shall be in writing and shall be final and binding upon the Employer, the Union and the employee or employees involved. The arbitrator may consider and decide only the particular grievance presented in the written stipulation of the Employer and the Union, and the arbitrator's decision shall be based solely upon an interpretation of the provisions of this Agreement. The arbitrator shall not have the right to amend, take away, modify, add to, change or disregard any of the provisions of this Agreement. In the event that an arbitrator shall determine that an employee has violated the Employer rule, regulation or policy for which said employee was charged, the arbitrator shall not have the right to reduce, modify or in any way alter or mitigate the penalty or discipline assessed by the Employer.

CBA, Art. XI, Step 4, § 4.

At the time of his termination from PGS, Mr. Roberts was the President of UGSOA, Local 26. The Complaint alleges that:

> The gravamen of the grievance and arbitration concerned the termination of Steve Roberts, who while acting as President of the UGSOA Local 26, was approached

-2-

>by a union member seeking direction and advice regarding a disciplinary matter. Approximately three months after the event, Mr. Roberts was terminated for failing to disclose the information he obtained from the union member to the Defendant. Mr. Roberts considered the information given to him as confidential and privileged because the act of a union member coming to him as an officer for advice was a protected, concerted activity.

Complaint, ¶ 9.

The Arbitrator Opinion provides the background factual situation that led to Mr. Roberts' termination. *See* [Court Doc. No. 1-1, Arbitrator Opinion]. PGS provides the physical security at three TVA nuclear power plants in Tennessee. This action concerns events occurring at the Sequoyah Nuclear Plant in Soddy Daisy, Tennessee. Mr. Roberts was an Armed Response Officer ("ARO") working for PGS who helped provide physical security at the Sequoyah Nuclear Plant. PGS terminated Mr. Roberts on October 5, 2007 for "willful violation of Employer or client rules or regulations" pertaining to the falsification of security documents of which Mr. Roberts had been informed on June 1st or 2nd 2007. Arbitrator Opinion, p. 4.

On May 31, 2007, one of PGS' security sergeants, Sergeant Hickey, failed to check an M-16 rifle carried by one of the AROs, Bonnie Houle, for missing ammunition rounds during the first four hours of that officer's shift. PGS' rules required the sergeant to check the rifle's ammunition during the first part of the ARO's shift. The sergeant checked the ARO's other equipment, with the exception of the M-16's magazine, and completed the required paperwork relating to the inspection.

Several hours into ARO Houle's shift, the TVA plant manager asked ARO Houle if she knew anything about an M-16 round of ammunition that had been found on the second floor of one of the plant's buildings known as the Diesel Building. ARO Houle responded that she knew nothing about the loose ammunition. Another sergeant security officer asked ARO Houle to

return to the Diesel Building where the loose round of ammunition had been found. Sergeant Hickey also arrived at the Diesel Building and checked ARO Houle's rifle magazine where she noticed that a round of ammunition was missing. Sergeant Hickey then took steps to falsify the inspection records to make it appear to PGS that she had discovered the missing round of ammunition upon her first inspection of ARO Houle's equipment. Sergeant Hickey took the prior paperwork and then asked ARO Houle to rewrite the inspection paperwork later that evening during a meeting following their shifts.

On June 2nd ARO Houle called the grievant, Steve Roberts, requesting union representation for rewriting the inspection paperwork. ARO Roberts did not report the falsification of the inspection records because he believed that the communication was privileged and involved "concerted activity" protected under the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 157, 158.

On September 15 an employee from the Nuclear Regulatory Commission ("NRC") contacted ARO Houle to discuss the falsification of documents. ARO Houle then met with the NRC employee and informed her about the situation surrounding the falsification of inspection records. Although the NRC employee asked ARO Houle not to discuss the situation with anyone else, ARO Houle also told another individual, Lieutenant Pope, about the entire situation at the request of the grievant. Not long after the meeting with Lieutenant Pope, PGS terminated Sergeant Hickey, ARO Houle, and the grievant Steve Roberts for failing to report the falsification of records. The Arbitrator Opinion only addressed the termination of Steve Roberts.

The administrative record includes portions of the TVA Nuclear Site Security Instruction Manual, Requirements and Responsibilities, Security Records Management. *See* [Court Doc.

No. 24, Administrative Record ("AR") (filed under seal)]. These rules provide that "Members of the Security Force (MSF)– MSF(s) utilizing paperwork for his/her assigned post ensure that the paperwork is the current revision, the information is complete and accurate, and all errors are properly corrected by a single line, initial and date (QA correction) in a way that prevents unauthorized changes (BLACK INK)." AR, at E-7, § 3.1.A. The record also includes PGS' rules pertaining to Conduct of Security Operations. AR, at E-8. These procedures include the provision that "[a]ll security related incidents, injuries, accidents or other events outside normal shift operating parameters will be immediately reported to the individual's immediate supervisor." AR, at E-8, § 3.1.3. Employees are also instructed that "[i]ndividuals observing an abnormal or unusual condition affecting site security will immediately report the observation to their supervisor. The observing individual will provide a description of the condition or event location and any security equipment affected." *Id.* at § 3.11. The record also includes a directive from TVA: "TVA NPG places special emphasis on resolving problems and concerns which are important to the safe and reliable operation of its nuclear plants. Employees are responsible to report safety and quality problems and assist in resolving them." AR, at E-9.

PGS' Policy Number 06-204 pertains to the Administration of Discipline for nuclear plants. AR, at E-14. The Policy states:

> The discipline program is divided into five (5) basic categories, the first of which is **"Major" or "Terminable"** offenses. These offenses are of a serious enough nature to warrant an employee's dismissal with no progressive disciplinary steps. The following offenses fall into this category, but are not limited to these examples: . . .
>
> 6.1.17 Falsification of records, log books, or other documents or statements in any matters related to employment with Pinkerton. . . .
>
> 6.1.20 Willful violation of Pinkerton or Client rules or regulations.

-5-

AR, at E-14, §§ 6.1.17, 6.1.20.

The administrative record contains a memorandum written by the Vice President of the PGS/TVA Project, Joel Wilcox, on October 1, 2007 explaining the reasons for Mr. Roberts' termination. AR, at E-15. The memorandum notes that "Officer Roberts will be terminated based on his failure to report the known falsification of Post 11 paperwork in a timely manner." *Id.*

During the arbitration hearing on June 25, 2008, PGS' Operations Lieutenant testified that the federal NRC requires PGS to maintain "accurate and complete documents." AR, Hearing Transcript, pp. 27-28. She further testified that PGS' policies require individuals to report events like falsification of paperwork to their supervisor due to its potential effect on site security. *Id.* at 32. The hearing testimony also established that Mr. Roberts learned of the falsification of paperwork on the night that it occurred, but the information regarding the falsification was not revealed to PGS officials until several months later in September. *Id.* at 68, 95, 142. During the hearing Mr. Wilcox testified regarding the reasons for the accurate record reporting requirements:

> We count on our Officers and our supervisors and our employees to provide protection to the nuclear plants, especially since after 09/11. It is a real threat, and I think people know it's a real threat at all of our plants.
>
> The requirement to report any issues is so that we can get any issues identified, corrected, and make sure that we're in compliance with all the regulatory compliance that we have . . .

*Id.* at 102.

Mr. Roberts also testified regarding his termination at the hearing. He asserted that he believed the information regarding the falsification of paperwork was privileged because he was

-6-

Case 1:08-cv-00285-RAE-WBC   Document 30   Filed 01/12/10   Page 6 of 16   PageID #: 214

acting as a union representative to a union member when he learned of the falsification. AR, Hearing Transcript, p. 175. He further testified that he knew that it violated PGS policies to falsify paperwork and that truthfulness and honesty were important traits in security officers at a nuclear facility. *Id.* at 183. He also understood that he was required to report any falsifications of paperwork. *Id.* at 184.

Following the hearing, the arbitrator concluded that PGS had "just cause" pursuant to the terms of the CBA for terminating the grievant, Mr. Roberts. Arbitrator Opinion. The Arbitrator Opinion indicates that the grievant "testified that he knew that he was required to immediately report any security incident, including the falsification of paperwork." Arbitrator Opinion, p. 7. The Arbitrator concluded that ARO Roberts' failure to report the falsification violated PGS' policies, as well as the terms of the CBA. The Arbitrator found that the CBA did not contain any reference to any kind of privilege for violating certain of PGS's policies. After extensively reviewing the positions of the parties, the arbitrator specifically found the following:

> With respect to the issue framed by the evidence, the Arbitrator accepts the Union's position that communications between an employee and a union official are under certain circumstances protected activity under Section 7 of the NLRA which do not have to be disclosed to an employer. But where the union official is also an employee a balance must be struck between his responsibility to his employer as an employee and his responsibility as a union official to represent bargaining unit employees. . . .
>
> Viewed in this context, compliance with Employer Procedure 05-224, Conduct of Security Operations, Section 3.1.2.K. which requires armed response officers to report all breaches of security and security violations to their immediate supervisors and with TVAN Site Security Instruction SSI-17.1, Section 3.0 which requires security officers to ensure that all paperwork is accounted for, accurate and complete, must be strictly adhered to. This is evidenced by Employer Procedure 06-204, Administration of Discipline, Section 6.1.17 which makes falsification of records or other documents grounds for dismissal. . . .
>
> The Arbitrator after careful consideration of the record evidence and the briefs filed by the parties finds that the balance in the instant case must be struck in

-7-

> favor of disclosure. This conclusion is based on the importance of the security work carried out at a nuclear facility. Granted failure to report the falsification immediately seems like a small matter but this policy and others like it are an integral part of the security plan the Employer has designed and implemented at the facility. The stakes are too high for the Arbitrator to second guess the Employer on security matters. Accordingly, under Article II of the collective bargaining agreement the Employer had just cause for terminating the Grievant's employment for failing to immediately report the falsification and therefore the confronting grievance dated October 15, 2007 is denied.

Arbitrator Opinion, pp. 14-17.

Following the Arbitrator's decision, the UGSOA requested that the National Labor Relations Board ("NLRB"), Region 10, review the Arbitrator's decision and requested that the NLRB not defer to the Arbitrator's opinion. *See* [Court Doc. No. 6-2]. The NLRB, Region 10, issued a decision on December 5, 2008 indicating that the Arbitrator's decision was "not clearly repugnant to the policies of the" NLRA. *Id.* Following Region 10's determination, the UGSOA appealed to the Office of the General Counsel for the NLRB. [Court Doc. No. 6-3]. Plaintiffs contended in their appeal that ARO Roberts was engaging in "protected activity" under the NLRA and thus, that it violated the NLRA for Defendant to terminate him. On June 4, 2009 the Office of the General Counsel for the NLRB sent a letter to the UGSOA's counsel indicating that its appeal was denied. [Court Doc. No. 28-3]. The letter states that "given the unique facts of this case, which involve security services at a nuclear facility, the arbitrator's decision upholding the discharge is not 'palpably wrong,' and is not repugnant to the Act." *Id.*

Plaintiffs have brought this action pursuant to 29 U.S.C. § 185 to modify and vacate the arbitrator's award. *See* Complaint. The Complaint asserts that "Arbitrator Dailey exceeded his authority and rendered an Opinion that constitutes a misuse of his powers, is in manifest disregard of the law and otherwise renders the CBA between the parties a nullity." Complaint, ¶

10.

## II. Analysis

Section 301 of the LMRA states:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Thus, Section 301 provides for district court jurisdiction over actions between a union and employer for alleged breach of contract.

The parties appear to agree on the applicable law that applies to this court's review of the arbitrator's decision. As the Sixth Circuit explained and as the *Steelworkers* trilogy directs:

> "The standard of review in arbitration cases is very narrow." An arbitrator's decision is proper if it "draws its essence from the collective bargaining agreement" and is not merely the arbitrator's "own brand of industrial justice". This is "[b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge" and thus "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept". "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."

*Mercy Memorial Hosp. Corp. v. Hospital Employees' Div. of Local 79*, 23 F.3d 1080, 1083 (6th Cir. 1994) (quoting *Anaconda Co. v. District Lodge No. 27, Int'l Ass'n of Machinists & Aerospace Workers*, 693 F.2d 35, 36 (6th Cir. 1982); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361 (1960); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38, 108 S.Ct. 364, 370-71 (1987)). *See also, United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347 (1960); *United Steelworkers v. American Manuf. Co.*, 363 U.S. 564, 80 S.Ct. 1343 (1960).

In *Misco* the Supreme Court reiterated the authority of a court reviewing an arbitrator decision established in the *Steelworkers* trilogy of decisions:

> . . . the Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate.
> "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
> "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim."

484 U.S. at 36-37, 108 S.Ct. 364 (quoting *United Steelworkers*, 363 U.S. at 564, 596-98, 80 S.Ct. at 1346, 1360-61). However, when an arbitrator "manifest[s] a disregard for the terms of the submission and a determination to exceed, if necessary, the limits of the authority and power conferred upon him" his award should be vacated. *Textile Workers Union of America v. American Thread Co.*, 291 F.2d 894, 901 (4th Cir. 1961).

In *Michigan Family Resources, Inc. v. Service Employees Int'l Union*, the Sixth Circuit outlined questions to consider regarding whether an arbitrator's award should be vacated:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying

>the contract"? So long as the arbitrator does not offend any of these
>requirements, the request for judicial intervention should be resisted even though
>the arbitrator made "serious," "improvident" or "silly" errors in resolving the
>merits of the dispute. . . . This view of the "arguably construing" inquiry no doubt
>will permit only the most egregious awards to be vacated. But it is a view that
>respects the parties' decision to hire their own judge to resolve their disputes, a
>view that respects the finality clause in most arbitration agreements, . . . and a
>view whose imperfections can be remedied by selecting better arbitrators.

475 F.3d 746, 753-754 (6th Cir. 2007). The Sixth Circuit emphasized in its decision that even a "serious error" is not subject to being overturned by a federal court due to "the import of asking fallible human beings to make final sense of imperfectly worded documents." *Id.* at 756.

The UGSOA asserts that a privilege exists protecting the confidentiality of a union employee's communications with her union representatives. It further asserts that the arbitrator found that such a privilege existed for ARO Houle's conversation with Mr. Roberts.

It is true that the NLRB has noted that "consultation between an employee potentially subject to discipline and his union steward constitutes protected activity in one of its purest forms." *Cook Paint and Varnish Co.*, 258 NLRB No. 1230. The NLRB explained in that decision that:

>To allow Respondent here to compel the disclosure of this type of information
>under threat of discipline manifestly restrains employees in their willingness to
>candidly discuss matters with their chosen, statutory representatives. Such
>actions by Respondent also inhibit stewards in obtaining needed information from
>employees since the steward knows that, upon demand of Respondent, he will be
>required to reveal the substance of his discussions or face disciplinary action
>himself. In short, Respondent's probe into the protected activities of Whitwell
>and Thompson has not only interfered with the protected activities of those two
>individuals but it has also caused a chilling effect over all of its employees and
>their stewards who seek to candidly communicate with each other over matters
>involving potential or actual discipline.

*Id.* at 1232. However, the NLRB declined to create a "blanket rule" and "emphasize[d] that our ruling in this case does not mean that all discussions between employees and stewards are

-11-

confidential and protected by the Act." *Id.*

In this matter the arbitrator addressed Mr. Roberts' grievance, which he described as being "discharged without just cause while acting as a union official." AR, at J-2. The arbitrator addressed this particular question and recognized that a privilege exists for communications between union representatives, such as Mr. Roberts, and union employees in certain circumstances. Arbitrator Opinion, pp. 14-17. However, he also recognized PGS' need to have employees adhere to its policies regarding the accuracy of records and reporting of security breaches. *Id.* The union argues that the arbitrator determined that Mr. Roberts' communications with Ms. Houle were privileged communications, but the arbitrator's opinion belies this assertion. The arbitrator merely indicated that communications such as the one between Mr. Roberts and Ms. Houle *may* be privileged under certain circumstances under the NLRA, but not that their particular conversation was privileged. *Id.* The arbitrator cited to numerous policies of both TVA and PGS relating to truthfulness and accuracy of documents, and indeed the administrative record contains copies of these policies. Further, the CBA specifically states that "[i]ncluded among management rights is the right to . . . discipline, suspend, or discharge employees for just cause; . . . the right to require employees to observe Employer policies, rules and regulations not inconsistent with this Agreement." CBA, Art. II. It further provides that

> The arbitrator shall not have the right to amend, take away, modify, add to, change or disregard any of the provisions of this Agreement. In the event that an arbitrator shall determine that an employee has violated the Employer rule, regulation or policy for which said employee was charged, the arbitrator shall not have the right to reduce, modify or in any way alter or mitigate the penalty or discipline assessed by the Employer.

CBA, Art. XI, Step 4, § 4. Further, any determination by the arbitrator is "final and binding" on the parties. *Id.* The arbitrator appropriately concluded that the CBA allowed PGS to discharge

-12-

an employee for just cause and that PGS could require employees to observe its policies. Further, the record supports PGS' position that PGS and TVA both had policies in place emphasizing the importance of reporting security breaches and maintaining accurate records. *See* AR, at E-7, § 3.1.A; E-8, § 3.1.3, 3.11; AR, at E-9; AR, at E-14, §§ 6.1.17, 6.1.20. PGS' Policy Number 06-204 provided that it was a terminable offense to willfully violate PGS' or TVA's rules or to falsify records. AR, at E-14, §§ 6.1.17, 6.1.20.

Mr. Roberts failed to adhere to those policies by not reporting the falsification of records for several months. Thus, the arbitrator's decision is directly supported by the language of the CBA – i.e. PGS' inherent right "to require employees to observe Employer policies, rules and regulations not inconsistent with this Agreement." CBA, Art. II.

The U.S. Supreme Court and the Sixth Circuit have made very clear that a federal court's review of an arbitrator's decision is very narrow. *See Misco*, 484 U.S. at 36-37. In *Michigan Family Resources*, the Sixth Circuit provided the three questions to be considered in making a determination regarding whether to vacate an arbitrator's award:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

475 F.3d at 753. The parties clearly submitted to the arbitrator the issue of whether just cause existed for Mr. Roberts' termination. *See* AR, at J-2, Roberts' Grievance. The union has not suggested, nor does the record support any inference that the arbitrator committed fraud, had a conflict of interest or otherwise acted dishonestly. And in determining whether the arbitrator was arguably construing the contract, the court must conclude that he was based on the express

-13-

provision of Art. XI, Step 4, § 4 in the CBA.

Further, federal courts have previously recognized the strong public policy behind enforcing security at a nuclear reactor facility. In *Iowa Electric Light and Power Co. v. Local Union 204 of the Int'l Brotherhood of Elec. Workers*, the Eighth Circuit emphasized the importance of safety regulations relating to nuclear facilities due to their importance to the community at large. 834 F.2d 1424 (8th Cir. 1987). The appellate court addressed a district court's decision to overturn an arbitrator's ruling to reinstate a union employee whom the employer had terminated. *Id.* at 1425. The district court's decision was made based on public policy grounds.

The employee at issue worked in the machine shop area of a federally-licensed nuclear facility. The employer terminated him after he bypassed a safety regulation and ignored the admonition of an engineer in a control room so that he could open a secured door in an unauthorized manner to leave early for lunch. *Id.* at 1426. The NRC approved of the termination following a report by government officials. *Id.* Following a hearing, an arbitrator ordered the employee reinstated. The court found that the employee knew that "he was short-circuiting an important safety system required by the federal government as a measure to protect the public from exposure to harmful radiation." *Id.*

In recognizing that arbitrator awards should be overturned only in very narrow circumstances, the appellate court recognized "the public policy of this nation concerning strict compliance with safety regulations at nuclear facilities." *Id.* In upholding the district court's decision to vacate the reinstatement, the Eighth Circuit elaborated:

> We conclude, however, that there is a well defined and dominant national policy requiring strict adherence to nuclear safety rules. . . . From the very beginning of

Case 1:08-cv-00285-RAE-WBC   Document 30   Filed 01/12/10   Page 14 of 16   PageID #: 222

> the nuclear power industry, the safety of nuclear power plants has been a matter of public concern. The federal government has been heavily involved in the planning, construction, and operation of nuclear plants since the enactment of the Atomic Energy Commission (AEC) in 1954. The NRC, the successor to the AEC, has promulgated volumes of safety rules that govern all nuclear power plants. . . . Each plant, in turn, develops its own more detailed specifications and regulations in order to obtain and then maintain its federal license. . . . Any violation of any rules must be reported to the NRC; the NRC responds by issuing enforcement penalties against the offending facility. . . . Nothing could be plainer than the public interest in the safe operation of nuclear power plants that underlies this panoply of federal regulations.

*Id.* at 1428. The Eighth Circuit also found it important that the employee at issue understood that his actions violated his employer's safety regulations. *Id.* at 1429-30.

In this action the court does not have the difficult task faced by the Eighth Circuit of affirming the vacation of an arbitration award. Instead, the decision that supports the clear public policy described in *Iowa Electric Light and Power Co.* also supports refusing to vacate the arbitrator's decision. The arbitrator recognized that a communication privilege exists between union members in certain circumstances, but he also recognized that the employer's policies, TVA's policies, and the CBA all supported the decision to terminate Mr. Roberts. Strict adherence to PGS' policies and TVA's policies is necessary because of the strong public policy regarding the safety of nuclear facilities outlined in *Iowa Electric Light and Power Co.* Indeed, even the Office of the General Counsel of the NLRB did not find fault with the arbitrator's decision. *See* [Court Doc. No. 28-3].

Because the arbitrator applied the terms of the CBA and PGS' and TVA's policies in finding there was just cause for Mr. Roberts' termination, this court is not at liberty to vacate his decision. Therefore, the union's motion to vacate will be **DENIED**.

**IV. Conclusion**

-15-

As outlined *supra*, the court concludes that the arbitrator did not act beyond the scope of his authority in determining that PGS had just cause to terminate Mr. Roberts. Therefore, the union's motion to vacate his decision will be **DENIED**.

A separate judgment will enter.

                                  */s/ R. Allan Edgar*
                                  R. ALLAN EDGAR
                         UNITED STATES DISTRICT JUDGE